IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ERIC A. VINCENT, et al., | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. MJM 22-3019 |
| UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OF DECISION

Plaintiffs Eric Vincent and Areti Vincent ("Plaintiffs") filed this civil action against the United States of America ("Defendant") under the Federal Tort Claims Act ("FTCA"), 18 U.S.C. §§ 2671, *et seq.*, for claims arising from a trip-and-fall incident. Eric Vincent suffered injuries when, while jogging, he tripped over a bolt protruding from a concrete slab on the ground where a postal collection box had been removed. Areti Vincent is his spouse. Plaintiffs assert claims for negligence and loss of consortium and seek a monetary award for non-economic damages.[1]

The parties appeared for a bench trial on November 13, 2024. At the close of Plaintiffs' case-in-chief, Defendant made an oral motion for judgment based on the defenses of assumption of risk and contributory negligence. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, this memorandum sets forth the Court's findings of fact and conclusions of law based upon the evidence and testimony presented at trial. For the reasons stated herein, Defendant's motion will be denied, and judgment will be entered in favor of Plaintiffs.

---

[1] In the original Complaint, Plaintiffs named the United States Postal Service ("USPS"), The United States of America, and Baltimore County, Maryland, as defendants in separate counts. Baltimore County was voluntarily dismissed as a defendant on March 6, 2024 (ECF 38), and USPS was terminated as a defendant on October 16, 2024 (ECF 55).

I.    **DEFENDANT'S RULE 52(c) MOTION**

For reasons explained below, the Court construes Defendant's oral motion for judgment as a motion for partial findings pursuant to Rule 52(c) and will rule on this motion in the course of deciding liability based on the evidence presented at trial.

Rule 50(a) of the Federal Rules of Civil Procedure provides that a party may move for judgment as a matter of law during trial, but this Rule applies only to jury trials. *See Nieto v. Kapoor*, 268 F.3d 1208, 1217 (10th Cir. 2001) (holding Rule 50 to be "inapplicable" to bench trials); *Spartan Concrete Prod., LLC v. Argos USVI, Corp.*, 929 F.3d 107, 112 (3d Cir. 2019) ("A judgment as a matter of law under Rule 50(a) can be granted only in jury trials . . . ."). Rule 52 applies to bench trials and includes a provision in subsection (c) that is textually similar to Rule 50(a). For this reason, the Court construes Defendant's motion as a Rule 52(c) motion. *See W. Trading v. Bell Avon*, 81 F.3d 155 (5th Cir. 1996) (construing Rule 50(a) motion presented at bench trial as a motion for partial findings under Rule 52(c)); *Gaffney v. Riverboat Services of Indiana, Inc.*, 451 F.3d 424, 451 n. 29 (7th Cir. 2006) (same).

Rule 52(c) provides that, during a bench trial, a court "may enter judgment . . . on a claim or defense that, under controlling law, can be maintained or defeated only with a favorable finding on that issue." The party against whom judgment is entered under Rule 52(c) must have been "fully heard" on the issue. Fed. R. Civ. P. 52(c). "The court may, however, decline to render any judgment until the close of the evidence." *Id.*

"In considering whether to grant judgment under Rule 52(c) the district court applies the same standard of proof and weighs the evidence as it would at the conclusion of the trial. . . . Accordingly, the court does not view the evidence through a particular lens or draw inferences favorable to either party." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 272 (3rd Cir. 2010)

(citations omitted). *See also Morales Feliciano v. Rullan*, 378 F.3d 42, 59 (1st Cir. 2004) (district court may make credibility findings and resolve conflicts in the evidence in deciding a Rule 52(c) motion); *Spartan Concrete Prod., LLC v. Argos USVI, Corp.*, 929 F.3d 107, 111 n.1 (3d Cir. 2019) (holding that the district court applied the wrong standard at a bench trial by drawing inferences in favor of the non-moving party).

Thus, the Court will make the factual findings and legal conclusions necessary to rule upon Defendant's Rule 52(c) motion concurrently with its findings and conclusions pursuant to Rule 52(a).

## II.     FINDINGS OF FACT

### A.  Plaintiffs' Background

1.      Mr. Vincent is 53 years old. The parties have stipulated his remaining life expectancy is 25.9 years. ECF 58 (Stipulation).

2.      In 2020, Mr. Vincent lived with his wife and daughter in Baltimore, Maryland. He lived a generally active lifestyle and exercised regularly. He is right-hand dominant. Trial Transcript ("Trial Tr.") at 54.

3.      From approximately 1994 to 2012, Mr. Vincent performed as a professional percussionist in the band Jah Works. Although he no longer performed regularly as a professional musician after 2012, Mr. Vincent continued playing percussion at home as a pastime "a couple of times a week" and performed professionally with other bands "from time to time." Trial Tr. at 42.

4.      Mr. Vincent has worked as a sound engineer since 2001. Sound engineering became his full-time occupation in 2012. As a sound engineer, Mr. Vincent is responsible for setting up music equipment for shows. He turns down more work than he accepts. Trial Tr. at 21.

### B.  USPS Collection Boxes

5.      At some point between July 1, 2018, and July 31, 2019, United States Postal Service ("USPS") removed a mail collection box that was stationed on a concrete slab next to a sidewalk just west of the intersection of Stanmore Road and Stevenson Lane in Towson, Maryland. Pl. Ex. 1 (Stipulations), ¶ 1.

6.      The USPS Maintenance Series Handbook provides that, "when removing street letter boxes from an existing location, technicians shall remove all anchoring devices, projections, stakes, and mounting slabs." Pl. Ex. 1, ¶ 2. Technicians shall perform any "necessary repair work to return the site to its original condition and to blend it with the surrounding area." *Id.* When removal of the mounting slab is not viable, "anchor bolts shall be cut flush to the surrounding surface." *Id*. The area "shall be made safe to the public" after a collection box is removed. Pl. Ex. 1, ¶ 3.

7.      When it removed the collection box from the intersection of Stanmore Road and Stevenson Lane, USPS did not remove the concrete mounting slab and failed to remove a protruding bolt from the slab or cut it flush to the slab. Pl. Ex. 1, ¶ 4.

8.      At some point between July 1, 2018, and July 31, 2019, USPS installed another collection box to the immediate west of the concrete slab with the protruding bolt. Pl. Ex. 1, ¶ 6.

**C. April 1 Incident**

9.      The incident at issue in this case occurred during the COVID-19 public health emergency.

10.      On April 1, 2020, Mr. Vincent went on a jog along a route he had run approximately 50 times before. Part of his jogging route ran along Stevenson Lane in Towson, Maryland. Trial Tr. at 25; Def. Ex. 5.

11.     As Mr. Vincent ran eastward along Stevenson Lane toward the intersection with Stanmore Road, he saw a woman approaching in the intersection. Mr. Vincent signaled to the woman that he would move to his right to avoid contact with her or getting in her way. Trial Tr. at 22.

12.     After passing the mail collection box on his right, Mr. Vincent moved to his right, stepping off the sidewalk. Trial Tr. at 22.

13.     Mr. Vincent suddenly felt a sharp pain in his right foot as a result of kicking into the bolt protruding from the concrete slab next to the collection box, causing him to trip and fall onto the street (the "April 1 Incident"). When he tripped, Mr. Vincent extended his left arm to the ground to break his fall. Trial Tr. at 22.

14.     When he walked toward the sidewalk to determine the cause of his fall, Mr. Vincent observed the "rusty brown" bolt, "surrounded by dirt" embedded in concrete that adjoined the sidewalk that he was jogging on. Trial Tr. at 23; Pl. Ex. 2B.

15.     The bolt was "bent, almost like a hook" at "a 45-degree angle" and facing the direction from which he was running." Trial Tr. at 23:7–10; Pl. Ex. 2B.

16.     This observation was the first time Mr. Vincent ever noticed the protruding bolt in the approximately 50 times that he had jogged along this path. He could not have been reasonably expected to notice the bolt while jogging eastbound along Stevenson Lane because his view of the bolt when approaching it to his right was obscured or obstructed by the mail collection box directly adjacent to the bolt. Even in the improbable circumstance that Mr. Vincent would have happened to look down to his right toward the ground while jogging, his movement at a rapid pace would have left him with extremely limited time to notice the bolt protruding from the concrete slab. Pl. Ex. 2A, 2B, 2C; Trial Tr. at 24–25.

17.       Mr. Vincent initially thought he could walk home, but he realized that he could not and called his wife to pick him up. Trial Tr. at 26:25–27:9.

18.       Mr. Vincent felt a burning pain in his left arm and knew it was injured. Trial Tr. at 27.

19.       Mr. Vincent's foot was red and started to "blacken pretty quickly… that evening." Trial Tr. at 27.

20.       In the days that followed the April 1 Incident, Mr. Vincent's left thumb, wrist, and forearm presented deep bruising. Pl. Ex. 9D, 9E.

### D.  Mr. Vincent's Medical Diagnosis and Treatment

21.       Mr. Vincent had five medical visits for diagnosis and/or treatment of injuries from the April 1 Incident. These visits included (1) an initial consultation on April 2, 2020; (2) an outpatient surgery performed on April 10, 2020; (3) a first post-operative appointment on April 21, 2020; (4) a second postoperative appointment on May 12, 2020; and (5) an appointment on August 29, 2023. Pl. Ex. 12, 14.

22.       On April 2, 2020, Mr. Vincent visited Greater Chesapeake Hand to Shoulder ("Greater Chesapeake") and was seen by Dr. Christopher Forthman, an orthopedic surgeon, for his wrist pain. Trial Tr. at 31–32.

23.       Dr. Forthman had x-rays taken of Mr. Vincent's left arm and diagnosed Mr. Vincent with (1) left distal radius comminuted intraarticular volarly displaced fracture (i.e., a broken left wrist); and (2) left scaphoid longstanding nonunion (also known as a "SNAC" fracture), with early arthrosis. Pl. Ex. 14.

24.        While, SNAC is known to cause arthritis, Dr. Forthman noted in his report that Mr. Vincent's wrist was "functioning at a fairly high level prior to the [April 1 Incident]." Pl. Ex. 14.

25.    Before the April 1 Incident, Mr. Vincent's SNAC fracture caused him no issues and did not affect his ability to play instruments, exercise, or perform his job as a sound engineer. Trial Tr. at 33–34.

26.    Mr. Vincent was "terrified" to have surgery. Specifically, due to the COVID-19 pandemic, he feared going to the hospital and "not com[ing] home." Trial Tr. at 35:6–14.

27.    On April 10, 2020, Dr. Forthman performed surgery on Mr. Vincent's wrist at Union Memorial Hospital to repair the fracture by installing a plate and set of screws. Mr. Vincent was administered anesthesia before the surgery. After the surgery, a stabilization board was placed under Mr. Vincent's arm, the arm was bandaged, and he was prescribed pain medication. Trial Tr. at 36–37.

28.    On April 21, 2020, Mr. Vincent went to his first post-operative examination at Greater Chesapeake with Physician Assistant Jacen Martinez. During this visit, his bandages, stabilization board, and sutures were removed. Trial Tr. at 37:20. Mr. Vincent's incision was described as "clean and dry," and his neurovascular status and digital motion were described as "intact." He was ordered to wear a splint for his arm full time, except when bathing, and to perform gentle range-of-motion exercises. Pl. Ex. 14.

29.    After the surgery, Mr. Vincent experienced intense pain that lasted "four or five weeks" and was recurring from time to time when his wrist felt overworked. Trial Tr. at 57:19–22.

30.    Mr. Vincent was told by Dr. Forthman that "it would still be a while" before he would be able to exercise. He went from exercising five to six days a week to not exercising at all. Trial Tr. at 38:23–39:16.

31.    During his second post-operative visit on May 12, 2020, Mr. Martinez noted that Mr. Vincent was "doing well," that he had "full range of motion of the digits," and that he could discontinue his splint. Mr. Martinez also noted that Mr. Vincent should "hold off" on activities like push-ups until his recommended follow-up visit, which Mr. Vincent ultimately did not attend. Trial Tr. at 58; Pl. Ex. 14. Mr. Vincent never sought medical treatment for his foot injury. Trial Tr. at 60.

32.    Mr. Vincent went back to Greater Chesapeake for this third and final post-operative visit on August 29, 2023, to discuss ongoing pain and discomfort in his left wrist and whether removal of the hardware from his wrist would help. During the visit, Dr. Forthman advised Mr. Vincent ways to mitigate his symptoms. Trial Tr. at 45–47.

33.    Dr. Forthman opined that Mr. Vincent's scaphoid nonunion went on to "develop more significant arthritis as a result of the injury to the wrist [sustained during the April 1 Incident]." Forthman De Bene Esse Deposition Transcript ("Forthman Tr.") at 32:14–17.

34.    Dr. Forthman predicted that, due to the quality of Mr. Vincent's fracture, he probably would "require surgical intervention down the road to manage the arthritis." Forthman Tr. at 36:14–17.

35.    Dr. Forthman opined that Mr. Vincent's limited range of motion in his left wrist would be permanent. Forthman Tr. at 39:13–14.

36.    Dr. Forthman opined that Mr. Vincent may require additional physician visits and medical interventions, such as steroid injections, braces, and a fusion surgery on the wrist in the future. Mr. Vincent would lose some use of his wrist as a result of any fusion surgery. Forthman Tr. at 42:7–10, 49:8.

37.    Dr. Forthman opined that, if Mr. Vincent required a wrist fusion surgery in the future, "half of it is due to the fall [Mr. Vincent] had, and about half of it is due to the problem he sustained as a teenager." Forthman Tr. at 50:2-6.

**E.  Impact on Plaintiffs' Quality of Life**

38.    Each Plaintiff testified about various ways in which Mr. Vincent's quality of life has changed since the April 1 Incident. These lifestyle changes include inability to play percussion; inability to take certain types of sound engineering jobs; inability to complete, or needing help with, certain household chores; and inability to engage in certain physical activities, including activities with his daughter. Plaintiffs' marital intimacy has also been negatively affected. Trial Tr. at 42–48, 77. The Court finds Plaintiffs' testimony about the changes in Mr. Vincent's quality of life to be generally credible.

39.    Specifically, Mr. Vincent testified that the range of motion in his wrist has not improved since his second post-operative visit and that he felt "frustrated" about his inability to play percussion instruments. Trial Tr. at 40–41.

40.    As to his sound engineering jobs, Mr. Vincent testified that he has started to turn down jobs that require a "line array system," which requires certain manual labor. Trial Tr. at 43.

41.    Mr. Vincent described his house as "an old brick house" that requires a lot of upkeep. He testified that, before his injury, he did a lot of the house maintenance himself, including masonry, plaster work, and landscaping. Trial Tr. at 43–44.

42.    Since the injury, however, Mr. Vincent has been "putting off projects a lot more." He completes projects like mulching and other labor-intensive tasks less frequently now and finds them to be difficult. Trial Tr. at 44.

43.    Mrs. Vincent testified that, since the April 1 Incident, she helps Mr. Vincent install window-unit air conditioners every year because he does not "trust that he can … bear the weight." Trial Tr. at 74.

44.    Mr. Vincent testified that the nature of physical activities that he is able to do with his daughter has changed. He testified that when visiting Rehoboth Beach before his injury, he would climb rock-climbing walls with his daughter, and he is no longer able to do that. He does not feel like "the same virile sort of man that [he] was." Trial Tr. at 47:8–18.

45.    When discussing his relationship with his wife, Mr. Vincent discussed feeling like he was letting her down due to his putting off house projects on account of his injury. Trial Tr. at 48.

46.    Mrs. Vincent testified that Mr. Vincent's activity level generally decreased after the April 1 Incident, and he has not been as active playing sports with their daughter. Mr. Vincent no longer feels "comfortable" handling the family's dogs. Trial Tr. at 72, 75–76.

47.    Plaintiffs' marital intimacy has "significantly reduced" due to his lack of comfort with positioning his arm. Trial Tr. at 77.

## III.    CONCLUSIONS OF LAW

### A.  Liability

The Court finds by a preponderance of the evidence that USPS negligently created a dangerous condition when it removed a mail collection box from a concrete mounting slab located at the intersection of Stanmore Road and Stevenson Lane. USPS left a bolt protruding from the slab that was inconspicuous and created a tripping hazard. USPS negligently failed to warn pedestrians of this dangerous condition. The foregoing negligent conduct proximately caused Plaintiffs to sustain injuries and losses, including loss of consortium.

The FTCA gives federal district courts

> exclusive jurisdiction of civil actions on claims against the United
> States, for money damages . . . for injury or loss of property, or
> personal injury or death caused by the negligent or wrongful act or
> omission of any employee of the Government while acting within
> the scope of his office or employment, under circumstances where
> the United States, if a private person, would be liable to the claimant
> in accordance with the law of the place where the act or omission
> occurred.

28 U.S.C. § 1346(b)(1). Because the alleged negligent acts of a USPS employee occurred in

Maryland, Maryland substantive law applies.

To establish negligence under Maryland law, the plaintiff must prove by a preponderance

of the evidence: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2)

that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4)

that the loss or injury proximately resulted from the defendant's breach of the duty." *100 Inv. Ltd.*

*P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 10 (Md. 2013) (emphasis and citation omitted).

"A claim for loss of consortium arises from the loss of society, affection, assistance, and conjugal

fellowship suffered by the marital unit as a result of the physical injury to one spouse through the

tortious conduct of a third party." *Oaks v. Connors*, 660 A.2d 423, 428 (Md. 1995) (citing *Deems*

*v. Western Maryland Railway Company*, 231 A.2d 514 (Md. 1967)). "Thus, '[a] loss of consortium

claim is derivative of the injured spouse's claim for personal injury.'" *Owens-Illinois, Inc. v. Cook*,

872 A.2d 969, 981 (Md. 2005). Damage to the marital relationship must be asserted jointly and

tried concurrently with the underlying physical injury so as to avoid the duplication of awards.

*Phipps v. General Motors Corp.,* 363 A.2d 955, 964 (Md. 1976).

First, Plaintiffs established that, at the time of the April 1 Incident, USPS controlled,

serviced, and maintained the area where a mail collection box was stationed and another collection

box had been previously removed, at the intersection of Stanmore Road and Stevenson Lane in Towson, Maryland.

Second, Plaintiffs established by a preponderance of the evidence that USPS breached its duty to leave the site of the removed collection box in a safe condition and deviated from standard practices in doing so. Specifically, USPS's failure to remove or cut the bolt protruding from the concrete slab created a hazard that a pedestrian or jogger would trip over it and injure themselves.

Third, Plaintiffs have established by a preponderance of the evidence that Plaintiffs suffered actual injuries. Their injuries include physical injuries to Mr. Vincent's left wrist and right foot, as well as physical pain and discomfort, inconvenience, and impacts on Plaintiffs' activities and quality of life, all of which flowed from Mr. Vincent's physical injuries. Plaintiffs have also established by a preponderance of the evidence that their martial relationship has been negatively impacted by Mr. Vincent's physical injury. Specifically, Mr. Vincent's assistance with certain household tasks and physical intimacy between Plaintiffs have both been reduced due to physical limitations and discomfort that flow from Mr. Vincent's wrist injury.

Finally, Plaintiffs have established by a preponderance of the evidence that Plaintiffs' injuries and losses were proximate results of Defendant's breach of its duty to leave the site of the removed mail collection box in a safe condition. In Maryland, "[t]o be a proximate cause for an injury, the negligence must be 1) a cause in fact, and 2) a legally cognizable cause." *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 195 (Md. 2012) (internal quotation marks and citation omitted). When "only one negligent act is at issue[,]" causation-in-fact may be found if "the injury would not have occurred absent or 'but for' the defendant's negligent act." *Pittway Corp. v. Collins*, 973 A.2d 771, 786–87 (Md. 2009). As previously discussed, the Court finds that Defendant was negligent in its removal of a mail collection box by leaving a bolt protruding from

the concrete slab on the ground, and further, that the protruding bolt was inconspicuous and posed a hazard. The Court finds that the injuries to Mr. Vincent's left wrist and right foot, and the damages that flowed from those injuries, would not have occurred had Defendant left the site of the removed collection box in a safe condition—specifically, without a bolt protruding from the ground. Leaving the bolt protruding from the ground caused Mr. Vincent to kick his right foot into the bolt and caused him to trip, which resulted in a broken left wrist and various other damages sustained by Plaintiffs, including their loss of consortium. Thus, causation-in-fact has been established.

Defendant's negligence is also a legally cognizable cause of Plaintiffs' injuries and losses. Determining whether the defendant's negligence is a legally cognizable cause involves "considerations of fairness or social policy as well as mere causation." *Peterson v. Underwood*, 264 A.2d 851, 855 (Md. 1970). "The question of legal causation most often involves a determination of whether the injuries were a foreseeable result of the negligent conduct[,]" *Pittway*, 973 A.2d at 788, that is, whether the actual harm "falls within a general field of danger that the actor should have anticipated or expected[,]" *Id.* at 787. To determine legal causation, the court may consider "the remoteness of the injury from the negligence [and] the extent to which the injury is out of proportion to the negligent party's culpability[.]" *Id.* at 788 (citation omitted). The test of foreseeability is "intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm, and to avoid the attachment of liability where . . . it appears 'highly extraordinary' that the negligent conduct should have brought about the harm." *Henly v. Prince George's Cnty.*, 503 A.2d 1333, 1340 (Md. 1986) (citation omitted). The Court finds by a preponderance of the evidence that Plaintiffs' injuries fall within a general field of danger that Defendant should have anticipated or expected when it left

the site of the removed collection box in an unsafe state. Mr. Vincent's injuries from tripping on the protruding bolt and falling are closely and directly connected to the unsafe condition of the protruding bolt. These injuries and their impact on Plaintiffs' quality of life were foreseeable and not out of proportion with the degree of Defendant's culpability in leaving the concrete slab in its hazardous condition.

Thus, a preponderance of the evidence presented at trial establishes proximate causation and Defendant's liability for Plaintiffs' damages.

## B. Affirmative Defenses

Defendant argues that Plaintiffs' recovery is barred by assumption of the risk and contributory negligence and because the unsafe condition of the ground where Mr. Vincent tripped was open and obvious. Under Maryland law, assumption of risk and contributory negligence are complete defenses to liability. *Ramseur v. United States*, 587 F. Supp. 2d 672, 685 (D. Md. 2007), *aff'd*, 283 F. App'x 998 (4th Cir. 2008).

### 1. Open and Obvious Doctrine

"The open and obvious doctrine imposes a duty on a plaintiff to exercise due care for her own safety." *Duncan-Bogley v. United States*, 356 F. Supp. 3d 529, 541 (D. Md. 2018). "An open and obvious condition is one that is apparent and recognizable to 'a reasonable person in the position of a visitor, exercising ordinary perception, intelligence, and judgment.'" *Id.* at 540 (quoting *Coleman v. United States*, 369 F. App'x 459, 462 (4th Cir. 2010)).

The Court finds by a preponderance of the evidence that the unsafe condition of the ground where Mr. Vincent tripped and fell was not open and obvious. The bolt in the concrete slab was small enough have reasonably gone unnoticed by pedestrians and joggers passing through the areas, although its protrusion was significant enough to create a tripping hazard. Its rusted

coloration and the unclean state of the concrete slab, the Court finds, caused both the bolt and the slab to blend in with the surrounding ground. Furthermore, given the direction from which Mr. Vincent was jogging, his view of the bolt was likely obscured by the mail collection box right next to it. In sum, a reasonable jogger in Mr. Vincent's position, exercising ordinary perception, would not have noticed the bolt protruding from the ground before tripping over it.

Defendant points out that there is no evidence of any mail carrier or anyone else ever tripped over the bolt. It further argues that the obviousness of the bolt is demonstrated by the fact that Mr. Vincent was able to identify it after he fell. These arguments are not convincing. More likely than not, Mr. Vincent was able to find the bolt promptly after he fell because he knew the exact location where he tripped and therefore knew exactly where to look. The lack of any trial evidence of other tripping incidents at that location does not rebut the clear photographic evidence and testimony showing the bolt to have been relatively hidden in its surroundings.

### 2. Assumption of Risk

"Assumption of the risk and contributory negligence are closely related and often overlapping defenses." *Schroyer v. McNeal*, 592 A.2d 1119, 1121 (Md. 1991). While assumption of risk "relieve[s] the *defendant* of the obligation of reasonable conduct towards the plaintiff[,] . . . . contributory negligence is the neglect of duty imposed upon all men and women to observe ordinary care for their *own safety.*" *Thomas v. Panco Mgmt. of Maryland, LLC*, 31 A.3d 583, 601–02 (Md. 2011) (cleaned up). To establish assumption of risk as a defense, "the defendant must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." *S & S Oil, Inc. v. Jackson*, 53 A.3d 1125, 1138 (Md. 2012) (quoting *ADM P'ship v. Martin,* 702 A.2d 730, 734 (Md. 1997)). "[W]hether the plaintiff had the requisite knowledge and appreciation of the risk" is determined by "an objective standard

. . . ." *C & M Builders, LLC v. Strub*, 22 A.3d 867, 882 (Md. 2011) (citation omitted). "[A] plaintiff

will not be heard to say that he did not comprehend a risk which must have been obvious to him."

*ADM P'ship*, 702 A.2d at 734 (quoting *Gibson v. Beaver,* 226 A.2d 273, 275 (Md. 1967)).

There was no evidence presented at trial to suggest that Mr. Vincent was aware of the risk

or appreciated the risk posed by the bolt protruding from the ground before he tripped on it. To the

contrary, Mr. Vincent testified that he did not observe the bolt before he tripped and fell. This

hazard, while dangerous, would have been inconspicuous to a reasonable pedestrian or jogger. The

rusted brown color of the bolt caused it to blend in with the dirt surrounding it.

In support of their oral motion for judgment, Defendants cited *Kauffman v. Richfood, Inc.*,

Civ. No. JFM-07-2589, 2008 WL 680220 (D. Md. Mar. 5, 2008). In *Kauffman*, summary judgment

was granted based on the plaintiff's deposition testimony that he had been aware of the hazard

(missing tiles) for "at least two or three months." 2008 WL 680220, at *1. Here, in contrast, no

evidence was presented at trial to suggest that Mr. Vincent was aware of the bolt protruding from

the concrete slab on the ground before he tripped and fell. Mr. Vincent testified that he "didn't

observe [the bolt] until after [he] had fallen." Trial Tr. at 24.

Defendant's assumption-of-risk defense thus fails.

### 3.  Contributory Negligence

Contributory negligence occurs when a person takes an action that "a person of ordinary

prudence" would not take, or "fail[s] to do something that a person of ordinary prudence would

do, under the circumstances." *Thomas*, 31 A.3d at 602 (quoting *Baltimore Cnty. v. State, Use of

Keenan*, 193 A.2d 30, 37 (Md. 1963)). It is determined by "an objective standard . . . ." *Id.* "Before

the doctrine of contributory negligence can be successfully invoked, it must be demonstrated that

the injured party acted, or failed to act, with knowledge and appreciation, either actual or imputed,

of the danger of injury which his conduct involves." *Id.* (quoting *Menish v. Polinger Co.,* 356 A.2d 233, 237 (Md. 1976)).

No evidence was presented at trial to indicate that, when Mr. Vincent tripped and fell, he knew (whether actually or constructively) or appreciated the danger of injury posed by running next to the mail collection box. Citing *Menish,* Defendant argued in support of their oral motion that Mr. Vincent was contributorily negligent because he "stepp[ed] off the sidewalk onto the concrete slab and kick[ed] the anchor bolt." Trial Tr. at 87. Referencing the area next to the sidewalk where the bolt was located, Defendant argued that Mr. Vincent "did not need to completely step off the sidewalk" and that this act proves that he "failed to observe carefully for his own safety . . . ." *Id.* The Court finds that Mr. Vincent's reason for stepping momentarily off the sidewalk—to avoid contact with an approaching pedestrian during the COVID-19 pandemic— was objectively reasonable. There was not sufficient time to expect that Mr. Vincent would carefully examine the ground next to the sidewalk before he kicked into the bolt and fell. In sum, the Court does not find that Mr. Vincent did anything a person of ordinary prudence would not do. Thus, Defendant's contributory negligence defense fails.

### C. Damages

Plaintiffs seek an award for non-economic damages as compensation for their injuries and losses.

Mr. Vincent experienced sudden distress and painful trauma to his right foot and left wrist, hand, and arm during the April 1 Incident. He felt a burning pain in his arm and was not able to walk home as an immediate result of the incident. He underwent a surgery that involved the installation of hardware in his wrist and caused substantial pain and minor disfigurement of his arm. He had to wear a stabilization board and bandages for almost two weeks and a splint for a

longer period following the surgery. His foot was significantly bruised for a period of time, although he did not seek medical attention for it. Mr. Vincent felt fear and anxiety about seeking medical treatment for his injuries due to the unprecedented public health emergency at the time. He had intense pain in his wrist for several weeks.

Mr. Vincent has experienced instability and limitations in the strength and range of motion of his left wrist as a proximate result of the April 1 Incident. More likely than not, his range of motion will remain limited to some degree for the remainder of his life, which is expected to approximate 25.9 years. Mr. Vincent lost the use of his hand and wrist immediately following the incident. His condition has improved since that time, but some loss in the use of his left wrist is likely to continue for the rest of his life. The Court notes, however, that Mr. Vincent is right hand dominant.

More likely than not, the incident proximately caused an exacerbation in a preexisting arthritic condition in Mr. Vincent's left wrist. He is likely to require further medical intervention in the future, which will be inconvenient, cause further pain, and involve difficult and stressful decision making. Future treatment is likely to include a painful wrist fusion surgery, which will be painful and result in further loss in the use of the wrist. If Mr. Vincent ultimately needs a wrist fusion surgery, the discomfort, pain, and inconvenience likely to occur during and after the surgery will only be 50% attributable to Defendant's negligence.

The April 1 Incident has substantially impacted Plaintiffs' lifestyle and emotional well-being. During the period following the incident, Mr. Vincent was not able to exercise effectively. He remains less active and less dexterous than he was before the incident. These impacts have affected his self-esteem and his relationships with Mrs. Vincent and their daughter. His ability to complete household tasks has been curtailed, such that necessary work around the house has been

delayed and has required more participation from Mrs. Vincent. Plaintiffs' marital intimacy has noticeably reduced with attendant emotional impacts on each Plaintiff. The incident has severely impacted Mr. Vincent's ability to participate in the valued pastime of playing percussion. The Court expects that, more likely than not, the foregoing quality-of-life and emotional impacts will affect Plaintiffs less as time passes.

Mr. Vincent's professional life has also been affected to the extent that he can no longer take certain sound engineering jobs that require significant physical activity. Additionally, he can no longer perform as a professional percussionist if future opportunities to perform should arise. The Court does not consider these limitations on Mr. Vincent's professional life to have substantially affected Plaintiffs financially or emotionally.

An award in the total amount of $130,000 is fair and adequate compensation for the foregoing injuries and losses. The Court will award $100,000 to Mr. Vincent in non-economic damages for Defendant's negligence and $30,000 to both Plaintiffs for loss of consortium.

## IV.   CONCLUSION

For the reasons stated in this memorandum, the Court will enter a judgment in favor of plaintiffs Eric and Areti Vincent and against defendant United States of America on the claims of negligence and loss of consortium in the second and fourth counts of the Complaint,[2] and award compensatory damages in a total amount of $130,000. A separate order will follow.

Date: December __23__, 2024

_____
Matthew J. Maddox
United States Magistrate Judge

---

[2]   The first count, against United States Postal Service, is dismissed in accordance with the Court's Order terminating USPS as a defendant. *See* ECF 55 (citing *Columbia Gas Transmission LLC v. United States*, Civ. No. 3:14-11854, 2015 WL 4276334, at *3 (S.D.W.Va. July 14, 2015)). The third count, against Baltimore County, has been voluntarily dismissed. *See* ECF 37